1

2

3

4

5

6

7

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 BRIAN KIMZEY,                                    ) Case No.: 1:09-cv-01808 JLT
                                                   )
12                              Plaintiff,          ) ORDER DIRECTING REMAND PURSUANT
                                                   ) TO SENTENCE FOUR OF 42 U.S.C. § 405(g)
13           v.                                    )
                                                   ) ORDER DIRECTING ENTRY OF JUDGMENT
14                                                 ) IN FAVOR OF PLAINTIFF BRIAN KIMZEY
    COMMISSIONER OF SOCIAL SECURITY,               ) AND AGAINST DEFENDANT
15                                                 ) COMMISSIONER OF SOCIAL SECURITY
                             Defendant.            )
16 _____ )

17         Brian Kimzey ("Plaintiff") asserts he is entitled to disability insurance benefits under Title II

18 of the Social Security Act.  Plaintiff argues the administrative law judge ("ALJ") erred in evaluating

19 the medical evidence and in rejecting his testimony and the testimony of a third party on credibility

20 grounds.  In addition, Plaintiff alleges the ALJ did not use the vocational expert testimony in a

21 proper manner.  For the reasons set forth below, the Court remands this matter for further

22 proceedings.

23                          **PROCEDURAL HISTORY**[1]

24         Plaintiff filed an application for disability insurance benefits on May 24, 2007, alleging

25 disability beginning November 18, 2006.  (AR at 9).  The Social Security Administration denied his

26 claim on September 25, 2007, and upon reconsideration denied the claim again on January 23, 2008.

27 *Id.*  After requesting a hearing, Plaintiff testified before an ALJ on January 27, 2009.  *Id.* at 201.  The

28

_____

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1  ALJ determined Plaintiff was not disabled, and issued an order denying benefits on April 6, 2009.

2  AR at 9-17.  Plaintiff requested review of the ALJ's decision by the Appeals Council of Social

3  Security, which was denied on August 8, 2009.  *Id.* at 1-3.  Therefore, the ALJ's determination

4  became the decision of the Commissioner of Social Security ("Commissioner").

5  ## STANDARD OF REVIEW

6  District courts have a limited scope of judicial review for disability claims after a decision by

7  the Commissioner to deny benefits under the Act.  When reviewing findings of fact, such as whether

8  a claimant was disabled, the Court must determine whether the Commissioner's decision is

9  supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's

10  determination that the claimant is not disabled must be upheld by the Court if the proper legal

11  standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y*

12  *of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

13  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

14  reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

15  389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938).  The record as a whole

16  must be considered, as "[t]he court must consider both evidence that supports and evidence that

17  detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

18  ## DISABILITY BENEFITS

19  To qualify for benefits under Title II of the Social Security Act, Plaintiff must establish he is

20  unable to engage in substantial gainful activity due to a medically determinable physical or mental

21  impairment that has lasted or can be expected to last for a continuous period of not less than 12

22  months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

23  his physical or mental impairment or impairments are of such severity that he is not only
unable to do his previous work, but cannot, considering his age, education, and work

24  experience, engage in any other kind of substantial gainful work which exists in the
national economy, regardless of whether such work exists in the immediate area in which

25  he lives, or whether a specific job vacancy exists for him, or whether he would be hired
if he applied for work.

26

27  42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

28  *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990); *see also* 20 C.F.R. § 404.1512 ("In general, you have

1   to prove to us that you are blind or disabled.").  When a claimant establishes a prima facie case of

2   disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other

3   substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

4                          **DETERMINATION OF DISABILITY**

5            To achieve uniform decisions, the Commissioner established a sequential five-step process

6   for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520(a)-(f).  The process requires

7   the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of

8   alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of

9   the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4)

10  had the residual functional capacity[2] to perform to past relevant work or (5) the ability to perform

11  other work existing in significant numbers at the state and national level.  *Id.*  In making these

12  determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony.

13  20 C.F.R. §§ 416.927, 416.929.

14  A.  Relevant Medical Evidence

15           Plaintiff was treated by Dr. Rafael R. Soria, and the record includes treatment notes from

16  2003 to 2009.  Dr. Soria treated Plaintiff for diabetes, hypertension, mixed hyperlipidemia, coronary

17  artery disease, depression, back pain, anxiety, and loose stools.  *See, e.g.,* AR at 206, 221, 237, 253,

18  435, 465, and 483.  In 2004, Plaintiff was treated primarily for his diabetes, and Dr. Soria noted

19  Plaintiff struggled with treatment compliance.  *See id.* at 253 (July 3, 2004: "Compliance with

20  treatment has been poor; he does not follow a diet and exercise regimen and does not follow-up as

21  directed"); *id.* at 251 (August 4, 2004: "complaint with meds, except doesn't check [blood sugars]

22  and will just administer regular insulin"); *id.* at 245 (November 12, 2004: "I again [recommended]

23  checking [blood sugars], but admits that he just won't do it").

24           In December 2005, Dr. Soria noted Plaintiff's alcohol abuse was in remission and he "feels

25  better with clearer mind."  AR at 235.  Dr. Soria stated Plaintiff "became complaint with meds in

26  _____

27       [2] The residual functional capacity is a determination of what a claimant "can still do despite [his] limitations."  20
    C.F.R. § 404.1545.  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step
    in which the ALJ assesses the claimant's residual functional capacity."  *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th

28  Cir. 2007).

                                    3

April" of 2006, and observed his blood sugar levels were better when Plaintiff was in compliance. *Id.* at 220. Between December 2005 and July 2006, Plaintiff complained of mild fatigue. *Id.* at 220-35. In addition, throughout July 2006, Dr. Soria determined Plaintiff suffered from depression, and observed that his mood and affect was "flat". *Id.* at 220, 222, and 218.

Dr. Soria noted Plaintiff was not checking his blood levels and was "gradually trying to improve [his] diet, but admit[ed] to having a difficult time" on October 4, 2006. AR at 216. Plaintiff no longer suffered from depression and had an "appropriate affect and demeanor." *Id.* On October 30, 2006, Dr. Soria found Plaintiff had elevated sugar levels, and "had been using [regular] insulin, but results [were] erratic." *Id.* at 214. Again, Dr. Soria opined Plaintiff had an "appropriate affect and demeanor."[3] *Id.*

During November 2006, Plaintiff had a surgical procedure performed by Dr. Patino on his right foot. *See* AR at 211 (Dr. Soria cleared Plaintiff for surgery at a pre-operation visit); *id.* at 164 ("Six months ago the patient had right foot surgery").

On December 18, 2006, Plaintiff was admitted to the emergency room at Emanuel Medical Center after his wife found him unresponsive. AR at 275, 357. Plaintiff's blood sugar levels had been erratic for the past several weeks, and he had difficulty with his diabetes. *Id.* Plaintiff's wife reported to Dr. Mohammad Larijani that Plaintiff "had poor compliance with his medications and diabetes" and he was "not complaint with diabetes care." *Id.* at 360. The death of Plaintiff's dog "caused him to grieve significantly." *Id.* at 275, 360. Plaintiff was "fairly depressed" after his foot surgery, because he "had to be lying around at home off his feet . . . which resulted in erratic eating patterns and foods, as well as resuming alcohol consumption after being sober for several months." *Id.* Also, Plaintiff's wife reported Plaintiff was depressed, but stated he had "no suicidal intention or ideation or plans." *Id.* at 360.

On May 17, 2007, Plaintiff was admitted to Emanuel Medical Center with prolonged mid-sternal chest pressure. AR at 161. Dr. Soria noted Plaintiff "has a long history of noncompliance with medications and medical advice." *Id.* at 340. Plaintiff was transferred to Memorial Medical

---

[3] Frequently, Dr. Soria opined Plaintiff's psychiatric exam demonstrated Plaintiff had an "appropriate affect and demeanor." *See, e.g.*, AR at 211, 214, 216, 225, 231, 233, 235.

1  Center, where the doctors determined he suffered an inferior wall myocardial infarction and treated

2  him by inserting a stent.  *Id.* at 161-62.  On May 21, 2007, Dr. Peter Lai noted Plaintiff's "treatment

3  has been uncomplicated;" Plaintiff denied having chest pain or tightness and was "ambulating

4  without difficulty."  *Id.* at 162; 169-70.

5       After his discharge from the hospital, Plaintiff continued cardiac treatment with Dr. Reza

6  Vafadouste on May 22, 2007.  AR at 191.  Dr. Vafadouste observed Plaintiff had a shortness of

7  breath, but Plaintiff denied palpitations and chest plain.  *Id.* at 192.  He advised Plaintiff to drink

8  alcohol with moderation and to stop smoking.  *Id.*  On June 6, 2007, Dr. Vafadouste recommended

9  that Plaintiff "should be off work at least for about six weeks or two months for now."  *Id.* at 195

10      On July 24, 2007, Plaintiff went to Emanuel Medical Center, "complaining of chest pain with

11  shortness of breath."  AR at 366.  Plaintiff described the pain as a non-radiating, once a day, at a "6

12  out of 10" pain level. *Id.*  At the time of his admittance, Plaintiff stated the pain was "4 out of 10."

13  *Id.*  Dr. Javier Rangel noted Plaintiff "appeared a bit anxious," and contacted Plaintiff's cardiologist,

14  Dr. Vafadouste, who informed Dr. Rangel that Plaintiff "has a history of anxiety.[4]"  *Id.* at 367-68.

15  Upon Dr. Vafadouste's recommendation, Dr. Rangel gave Plaintiff Lasix, after which Plaintiff stated

16  "he felt much better [and] wanted to go home."  *Id.* at 368.

17      Dr. Deborah von Bolschwing performed a consultative examination on August 21, 2007.  AR

18  at 375-78.  At the consultation, Plaintiff reported his prior drug use, which began when he was

19  sixteen, and summarized his medical history.[5]  *Id.* at 377-78.  Dr. von Bolschwing observed that

20  Plaintiff's "thought process was linear . . . [and] thought content was logical."  *Id.* at 376.  Plaintiff's

21  insight and judgment "appeared to be fair," and his mood was "mildly anxious," and his affect was

---

23  [4] On May 23, 2007, Dr. Soria observed Plaintiff's mood and affect was "anxious."  AR on 206.  Also, Dr. Soria

24  included a diagnosis of anxiety in his assessment on June 27, 2007.  *Id.* at 435.  On December 16, 2008, Plaintiff complained of "anxiety . . . loss of motivation; [and] mild panic attacks at times."  *Id.* at 483.  Other treatment notes from Dr. Soria do

25  not mention Plaintiff's anxiety.

26  [5] Plaintiff reported to Dr. von Bolschwing that he had a heart attack on May 16, 2007, for which he was hospitalized for five days. AR at 375.  Also, Plaintiff stated he had "experienced depression since 2007, in reaction to his physical health

27  problems and the resulting changes in his life style" that worsened after his heart attack.  *Id.*  Plaintiff told Dr. von Bolschwing he had been taking antidepressants for approximately ten years, and was currently taking medication for anxiety and

28  depression that were "partially helpful in reducing his symptoms."  *Id.* at 375-76.  Further, Plaintiff reported that he suffered from panic attacks, hypertension, diabetes, right and left knee pain, and low back pain.  *Id.* at 375.

"mildly restricted." *Id.* Plaintiff's IQ was within the normal range and Dr. von Bolschwing found Plaintiff's performance on the WAIS-III, WMS-III, and Trail-Making tests suggested his "overall intellectual ability within the average range, with mildly fluctuating attention and concentration." *Id.* at 377-78. Dr. von Bolschwing concluded Plaintiff had the ability "to understand, remember, and carry out simple, detailed, and complex instructions." *Id.* at 378. Plaintiff "had mild difficulty maintaining attention and concentration for the duration of the evaluation" and "demonstrated adequate pace and persistence." *Id.* In addition, Dr. von Bolschwing stated Plaintiff had "mild difficulty" with the stress of the interview, and concluded he was "likely to have mild difficulty adapting to changes in routine and work-related settings." *Id.*

On August 30, 2007, Dr. Joseph Garfinkel performed a consultative examination. AR at 379-84. Plaintiff's chief complaints were: heart attack; back pain; right foot pain; right and left knee pain; depression, anxiety, and mood swings; increased blood pressure; diabetes; and increased cholesterol. *Id.* at 379. Plaintiff stated his back pain was "worse with increased activities, standing, and bending," and improved with lying down, decreased activities and medicine. *Id.* at 380. Plaintiff reported he was "not dizzy, sick to his stomach, or have bladder control problems." *Id.* Upon examination, Plaintiff complained of pain in his right leg and his upper extremities, though he had full range of motion. *Id.* at 382. In Plaintiff's wrists and hands, Dr. Garfinkel found "no evidence of tenderness to palpitation." *Id.* at 383. Plaintiff had normal ranges of motion in his shoulders, elbows, wrists, hands, hips, knees, and left ankle. *Id.* Dr. Garfinkel determined Plaintiff's strength was "5/5 in all extremities, except for the right lower extremity, which is 3/5." *Id.* Plaintiff wore a walking cast at the examination, and was unable to walk on his heels and toes. *Id.* at 382-83. Given these findings, Dr. Garfinkel concluded: "The claimant can lift and carry 10 pounds occasionally and 10 pounds frequently. The claimant can stand and walk for less than 2 hours in an 8-hour day. The Claimant can sit for 6 hours in an 8-hour day." *Id.* at 384. Dr. Garfinkel did not find Plaintiff had postural, manipulative, visual, communicative, or environmental limitations. *Id.*

Dr. Starace completed a "Psychiatric Review Technique" on September 11, 2007, and opined Plaintiff had medically determinable impairment that was "not severe." AR at 387-403. Dr. Starace opined Plaintiff had an affective disorder, an anxiety-related disorder, and substance addiction. *Id.* at

387.  Dr. Starace noted there was "no apparent psych hospitalization [history] and no formal psych [treatment]."  *Id.* at 396.  Further, Dr. Starace referenced the examination of Dr. von Bolschwing, stating: "Psych CE . . . findings are also benign.  Specifically, standards assessments (WAIS-III and WMS-III) provide scores in the average range and remainder of CE findings do not support the presence of any significant limitations."  *Id.*  Dr. Starace opined Plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  *Id.* at 397.

On September 13, 2007, Dr. R.D. Fast completed a "physical residual functional capacity assessment" of Plaintiff.  AR 404-408.  Dr. Fast opined Plaintiff could occasionally and frequently lift and/or carry ten pounds; stand and walk with normal breaks for a total of at least two hours in an eight-hour day; and sit with normal breaks for a total of about six hours in an eight-hour day.  *Id.* at 405.  Plaintiff's ability to push and pull was limited in his right lower extremity due to the use of a walking cast.  *Id.*  Dr. Fast opined Plaintiff was limited to climbing ramps and stairs occasionally and never climbing ladders, ropes or scaffolds.  *Id.* at 406.  Plaintiff could frequently stoop, kneel, crouch, and crawl.  *Id.*  Dr. Fast found no manipulative, visual, or communicative limitations, and the only environmental limitation was a need to avoid concentrated exposure to hazards such as machinery and heights due to his walking cast.  *Id.* at 406-07.  Dr. Fast stated that, generally, "claimant's allegations are supported but his allegation that he is on bedrest (sic) due to his [myocardial infarction] is not credible, since his occlusion was stented with good results."  *Id.* at 408.  Moreover, Dr. Fast opined Dr. Garfinkel's conclusions were not supported by evidence in the file because Plaintiff's report's reported activities (that he could shop, do housework including vacuuming and cleaning,  and walk up to 25 minutes and then resume walking after a five minute break) "require at least sedentary stand/walk capability."  *Id.*

In 2008, Dr. Soria continued to treat Plaintiff, following up on his hypertension and diabetes.  *See, e.g.,* AR at 426, 464-69, 482-83.  On February 6, 2008, Plaintiff reported he "feels well" and that his "mood has been good."  *Id.* at 469.  On June 20, 2008, Plaintiff complained of having "loose stools episodically over past one year" and bowel movements "very soon after eating."  *Id.* at 467.  In August, Dr. Soria noted Plaintiff was compliant with his medication but not with his diet, and

1  recommended Plaintiff be very strict in avoiding all dairy foods for a month to treat his loose stools.

2  *Id.* at 464-65.  Plaintiff continued to have loose stools in December 2008, and had stopped eating

3  dairy foods, but the symptoms persisted.  *Id.* In both August and December, Dr. Soria observed

4  "stools studies negative."  *Id.* at 464, 482.

5      Dr. Soria completed a questionnaire regarding Plaintiff's ability to work on January 12, 2009.

6  AR at 485.  Responding to a question of whether "the medical problems for which [he] treated the

7  claimant preclude [Plaintiff] from performing any full-time work at any exertion level, including the

8  sedentary level," Dr. Soria answered "yes."  *Id.*  Dr. Soria stated Plaintiff's primary impairments

9  were: "diabetes that is difficult to control, retinopathy, [and] hand and leg/foot paresthesias. *Id.*  Dr.

10  Soria opined Plaintiff could sit for 4-6 hours total and stand and/or walk for 1-3 hours total in an

11  eight-hour day, and Plaintiff did not need to lie down or elevate his legs.  *Id.*  Further, Dr. Soria

12  believed Plaintiff had been disabled to this degree for the "past couple of years."  *Id.*

13  B.  Hearing Testimony

14      Plaintiff testified at the hearing before the ALJ on January 27, 2009, at which time he was

15  forty-two years old.  AR at 20-21.  Plaintiff stated he was married and lived with his wife in an

16  apartment.  AR at 21-22.  Plaintiff said he completed the twelfth grade.  *Id.* at 23.

17      Plaintiff testified that he was a printing press operator from 1986 to 1995.  AR at 36.  This

18  job required him to lift pallets of fiber that weighed about twenty or thirty pounds.  *Id.* at 37.  Also,

19  Plaintiff said had  worked as a warehouse supervisor, which required him to direct personnel, receive

20  and transfer goods, and to lift and carry twenty-five to fifty pounds while unloading trucks.  *Id.* at 37-

21  38.  In addition, Plaintiff testified that his last position was as a car wash area manager, for which he

22  took a six-week management course in 2004.  *Id.* at 23.  Plaintiff estimated he worked as area

23  manager for a year, and stopped working when he had surgery to repair his foot, which he said

24  "never healed properly."  *Id.* at 25.  Plaintiff said he could not be on his feet "for a long time without

25  it hurting."  *Id.*

26      When asked if "[a]ny other medical problems [kept him] from working" besides his foot

27  impairment, Plaintiff responded, "I would say my diabetes."  AR at 25.  Also, Plaintiff said he had a

28  heart attack in May 2007 and as a result took Lasix for chronic heart failure.  *Id.* at 26.  Plaintiff

testified the Lasix gave him "gastric issues," including frequent urination where he has to use the restroom "about every two hours" and diarrhea that, on a bad day, causes him to use the restroom an average of six to eight times. *Id.* at 26-27. Plaintiff said his doctors "tested for bacteria that causes diarrhea," and the test was negative. *Id.* at 28. Plaintiff said the doctors prescribed medicine, but neither the prescription nor over-the-counter medication helped his symptoms that included "chronic thirst, shakiness, dizziness, lack of concentration and profuse sweating." *Id.*

Plaintiff attributed his decreased concentration to his diabetes, and estimated that the longest he could concentrate at one time before starting to drift off was "about 30 minutes." AR at 28. Plaintiff said he tested his blood sugar levels, and in the three months prior to the hearing his levels ranged from 200 to 350. *Id.* In addition, Plaintiff reported feelings of shakiness and dizziness "two to three times a day," when his blood sugar was either elevating or dropping, and said it lasted "like 30 minutes and then within an hour and a half, two hours [he] will probably feel better, yet weak." *Id.* at 28-29. Also, Plaintiff stated he slept "very poorly" due to "getting up to go to the bathroom" and "racing thoughts." AR at 30.

On an average day, Plaintiff said he would do chores such as emptying the cat litter box, taking garbage out to the container, and taking his dog for a small walk. AR at 30. Plaintiff testified he had given up activities because "it's hard to find a bathroom sometimes." *Id.* at 31. Plaintiff clarified he had did not have regular activities such as sports or church prior to his illness, and said his current hobbies included watching television and walking his dog. *Id.*

Plaintiff said he was being treated for neuropathy that caused numbness and tingling in his hands: "[s]ometimes it feels like someone stabs you with a needle." AR at 32. Plaintiff stated it was difficult for him to grasp items and estimated that he could write, or do other activities requiring him to grasp, for "five to 10 minutes, no more." *Id.* Also, Plaintiff testified that his ability to lift heavier items was affected by the neuropathy. *Id.* at 33. Plaintiff estimated he could lift "25 pounds for a short period of time," and "probably five to 10 pounds" repetitively throughout a day. *Id.* at 33.

Plaintiff stated he could be on his feet or sit for approximately thirty minutes each. AR at 33. He said that his feet would swell, but the swelling was less if he elevated his feet. *Id.* at 34. Plaintiff estimated that he elevated his feet five to ten times a day, and elevated his right foot the most. *Id.*

1   When questioned about this practice, because Dr. Soria opined Plaintiff did not "have to lie down or

2   elevate," Plaintiff stated: "I probably haven't told them enough, I guess. I don't know. I think he'd

3   know by now." *Id.*

4        According to Plaintiff, Dr. Soria was treating his problem with depression.  AR at 34-35.

5   Plaintiff stated, "I have a hard time being around people, going to crowded places.  I have feelings of

6   racing thoughts and sometimes I feel like everybody's out to get me and the walls are closing in." *Id.*

7   at 35.  Dr. Soria prescribed Lexapro for Plaintiff's depression, and Plaintiff stated he had switched

8   medication "probably four times in the last two years."  *Id.* at 35.  Plaintiff stated he had been

9   referred to a psychologist, and was waiting to see one, but "money's an issue." *Id.* at 35-36.  Further,

10  Plaintiff stated his depression restricted his ability to do work because "you have to be able to talk to

11  people to do work . . . [and] be able to do things, communicate." *Id.* at 36.

12       Vocational expert ("VE") Stephen Schmidt testified at the hearing after Plaintiff.  The VE

13  characterized Plaintiff's past work as follows: "Shipping and receiving . . . 222387050, medium,

14  SVP 5.  Press operator, 651382042, light, SVP 8.  Car wash supervisor, 915137010, light, SVP 5.

15  The record reflects heavy exertion.  Area manager, 183117010, sedentary, SVP 8.  It appeared to be

16  performed at light." AR at 38.   Then, the VE considered a hypothetical individual who was the

17  same age as Plaintiff, with the same education and work experience.  *Id.*  In addition, the ALJ added

18  the following limitations regarding this hypothetical person that were based upon the assessment of

19  Dr. Fast: the person could lift 10 pounds frequently; stand at least two hours in an eight-hour day; sit

20  six hours in an eight-hour day; climb ramps and stairs occasionally, but never ladders, ropes or

21  scaffolds; balance occasionally; and stoop, kneel, crouch and crawl frequently.  *Id.* at 38-39.  Further,

22  the individual "[s]hould avoid concentrated exposure. . . such as moving machinery and heights." *Id.*

23  at 39.  In response, the VE opined the person would be able to perform work as an "area manager as

24  performed within the national economy," and explained the position is "defined as sedentary as

25  performed, [but] appeared to be performed at light[6]." *Id.*

26  _____

27        [6] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like
    docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).  Also, "a certain amount of walking and standing is often

28  necessary in carrying out job duties." *Id.*  Light work is defined as "lifting no more than 20 pounds at a time with frequent
    lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R § 404.1567(b); 1983 SSR LEXIS 30.

1    If use of the hands bilaterally was restricted to "no more than occasionally for job tasks," in

2    addition to the restrictions placed by the ALJ in the hypothetical, the VE opined that such a person

3    could not perform Plaintiff's past relevant work or other jobs.  AR at 40.  The VE stated that in order

4    to perform past relevant work as an area manager, a person would need to be able to use hands

5    frequently: "hand usage is not strenuous, but for paperwork, documentation, computer usage, that is

6    all a significant part of the job."  *Id.* at 41.  Thus, when coupled with the other restrictions, the VE

7    opined that there would be no jobs available if the person was restricted to only occasional hand use.

8    *Id.*  Also, the VE concluded a person would not be able to do any work competitively if he "would

9    have to be able to leave the work site for the bathroom to the degree that was testified . . . at least 10

10    to 12 times in the daytime."  *Id.* at 40.

11    Plaintiff's counsel asked the VE whether he had looked at the position of car wash area

12    manager in the work place or if he had seen it in his experience as a vocational expert.  AR at 39.

13    The VE responded that he observed the area manager position in industries other than car washes,

14    and they often had more exertional requirements than the sedentary level: "because of handling an

15    area they may frequently be traveling and going – walking to different locations, divisions, stores,

16    [and] services."  *Id.* at 40.

17    C.  Third Party Testimony

18    Lisa Kimzey, Plaintiff's wife, completed a third party "function report" on June 16, 2007.

19    AR at 129-36.  Mrs. Kimzey reported Plaintiff "usually can't sleep at night" due to stress, pain, and

20    anxiety and then tries to sleep during the day.  *Id.* at 129.  She stated that Plaintiff's daily activities

21    included watching television; walking their dog for 10 minutes, if he was fatigued; and visiting his

22    parents, when he had the energy or was not in pain.  *Id.*  Likewise, she reported that Plaintiff's

23    hobbies and interests included watching television with his dog, reading, and visiting with family.

24    *Id.* at 133. According to Mrs. Kimzey, Plaintiff needed assistance with dressing and bathing.  AR at

25    130.  She stated Plaintiff that "needs help with his [right] leg moon boot and sometimes with

26    buttoning his shirts."  *Id.*  In addition, she reported that she usually took care of Plaintiff's hair, and

27    would take him to get it cut.  *Id.*  When Plaintiff showered, she reported that, he used a "shower

28    chair [at] times."  *Id.*

11

1    Mrs. Kimzey stated that she assisted Plaintiff with his insulin "at times" and medication

2    because "frequently he needs to be reminded of the date and to take pills." AR at 131.  She reported

3    that she made complete meals and did "all of the cooking."  *Id.*  She said Plaintiff used to cook, but it

4    was "too dangerous now" because Plaintiff would forget that the oven was on, and he could only

5    prepare small items and snacks.  *Id.*  Mrs. Kimzey stated Plaintiff was able to do light dusting,

6    vacuuming in small amounts, and fold clothes, but opined Plaintiff "takes about double the normal

7    time due to frequent rest periods, especially after his [right] foot surgery and heart attack." *Id.*  She

8    felt being productive "helps elevate his mood, but he gets fatigued quickly."  *Id.*

9    In addition, Mrs. Kimzey stated Plaintiff had difficulties with anxiety and stress, and he was

10   off work in July of 2006 "for stress leave." AR at 133, 135.  She opined Plaintiff "isn't very good at

11   stress, and it causes more medical issues for him from [higher] blood pressure, to chest pain to

12   diabetic issues." *Id.* at 135.  Also, she reported that Plaintiff would get "anxious or 'moody'" and

13   liked to be alone "so he doesn't hurt others [sic] feelings." *Id.* at 134, 136.

14   Further, Mrs. Kimzey indicated Plaintiff's impairments affected the following abilities:

15   lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair

16   climbing, seeing, memory, completing tasks, concentration, understanding, following instructions,

17   using his hands, and getting along with others. AR at 134, 136.  She stated when sitting, Plaintiff

18   changed position frequently, and many activities were limited due to his right foot issues.  *Id.* at 136.

19   Mrs. Kimzey reported Plaintiff's stress and anxiety decreases his memory and concentration.  *Id.*

20   D.   The ALJ's Findings

21   Pursuant to the five-step process, the ALJ determined Plaintiff had not engaged in substantial

22   gainful activity since the alleged onset date of November 18, 2006.  AR at 11.  Second, the ALJ

23   found Plaintiff has the following severe impairments: "foot pain status post foot surgery for heel

24   spur; coronary artery disease status post myocardial infarction status post stent; diabetes mellitus,

25   insulin dependent; and history of polysubstance abuse until May 2007 (methamphetamine, cocaine,

26   and alcohol)." *Id.*  Though Plaintiff complained of depression and anxiety, the ALJ found he did not

27   have a severe depressive disorder or anxiety because his mental impairments "do not cause more

28

1  than minimal limitation in the claimant's ability to perform basic mental work activities." *Id.* at 12.

2  The ALJ determined that these impairments did not meet or medically equal a listing. *Id.*

3      At the fourth step, to determine Plaintiff's residual functional capacity ("RFC"), the ALJ

4  considered "the entire record." AR at 13.  The ALJ determined:

> [T]he claimant has the residual functional capacity to lift and/or carry 10 pounds
> occasionally and 10 pounds frequently; stand or walk for at least two hours out of an 8-
> hour workday; sit for six hours out of an 8-hour workday; no pushing and/or pulling with
> the right lower extremity; frequent stooping, kneeling, crouching, and crawling;
> occasional climbing ramps and stairs; no climbing ladders, ropes, and scaffolds; and
> needs to avoid concentrated exposure to hazards such as unprotected heights and moving
> machinery.

9  *Id.*  The ALJ concluded Plaintiff was capable of performing past relevant work. *Id.* at 16.  In

10  addition, the ALJ found the limitations of Plaintiff's RFC "have little or no effect on the whole

11  occupational base of sedentary level work." *Id.* at 17.  Thus, the ALJ concluded Plaintiff was not

12  disabled from November 18, 2006, through the date of the decision. *Id.*

## DISCUSSION AND ANALYSIS

14  **A.  The ALJ was not obligated to develop the record for the purpose of determining the**

15  **exertional requirements of Plaintiff's past relevant work.**

16      As an initial matter, Plaintiff argues the ALJ failed to comply with Social Security Ruling[7]

17  ("SSR") 82-61 and SSR 82-62, and was obliged to further develop the record to determine the

18  physical and mental requirements of Plaintiff's past relevant work.  (Doc. 14 at 8-11).

19      To determine whether a claimant retains the capacity for past relevant work, the Social

20  Security Administration has set forth the following three tests:

> 1.  Whether the claimant retains the capacity to perform a past relevant job based on a
> broad generic, occupational classification of that job, e.g., "delivery job," "packing job,"
> etc.
>
> 2.  Whether the claimant retains the capacity to perform the particular functional
> demands and job duties peculiar to an individual job as he or she actually performed it.
>
> 3.  Whether the claimant retains the capacity to perform the functional demands the job
> duties of the job as ordinarily required by employers throughout the national economy.

---

[7] Rulings are issued by the Commissioner to clarify regulations and policies.  Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

SSR 82-61, 1982 SSR LEXIS 31, at *2-3.  To determine how a claimant *actually* performed his

work, an ALJ may consider: "(1) the claimant's own testimony, and (2) a properly completed

vocational report." *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002), citing *Pinto*, 249 F.3d at

845, *accord.* SSR 82-61, SSR 82-41; *see also* SSR 82-62, 1982 SSR LEXIS 27, at * 6-7 ("statements

by the claimant regarding part work are generally sufficient for determining the skill level, exertional

demands and nonexertional demands of such work").  Usually, "the best source for how a job is

*generally* performed" in determining the requirements of a claimant's past relevant work is the

*Dictionary of Occupational Titles*,[8] and vocational expert testimony may be considered at step four

of the analysis.  *Pinto v. Massanari*, 249 F.3d 840, 845-46 (9th Cir. 2001) (emphasis added).

Plaintiff argues the ALJ's classification of Plaintiff's past relevant work as "area manager . . .

inappropriately relies on the generic classification of the occupation . . . [which] contravenes the

policy guidelines of SSR 82-61." (Doc. 14 at 9).  Plaintiff asserts the ALJ used the first test, though

SSR 82-61 states: "Finding that a claimant has the capacity to do past relevant work on the basis of a

generic occupational classification of the work is likely to be fallacious and unsupportable." *Id.* at 9-

10; *see also* SSR 82-61, 1982 SSR LEXIS 31, at *3.  However, the ALJ did not use the first test, but

rather the ALJ classified the position as ordinarily performed in the national economy with the use of

the vocational expert, who testified Plaintiff's work was as an area manager, *DOT* 183.117-010.

According to SSR 62-61, "The *Dictionary of Occupational Titles* (DOT) descriptions can be relied

upon . . . to define the job as it is *usually* performed in the national economy." *Id*, 1982 SSR LEXIS

31, at *3.  Therefore, the ALJ did not err in classifying Plaintiff's work as generally performed in the

national economy.

Further, the ALJ did not have a duty to develop the record as to the manner in which Plaintiff

*actually* performed his past work.  Under SSR 82-62: "Detailed information about strength,

endurance, mental demands and other job requirements must be obtained as appropriate.  This

information will be derived from a detailed description of the work obtained *from the claimant*,

---

[8] The *Dictionary of Occupational Titles* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d)(1).

1  employer, or other informed source." *Id.*, 1982 SSR LEXIS 27, at *8.  Here, Plaintiff provided a

2  statement in which he explained the exertional requirements of this position.  *See* AR at 98-99.

3  Plaintiff stated the position required him to walk, stand, sit, climb, stoop, kneel, crouch, crawl,

4  handle objects, and reach for a majority of the day.  *Id.* at 99.  Plaintiff's description led the

5  vocational expert to determine his work as an area manager "appeared to be performed at light"

6  exertional level.  *Id.* at 38.  Notably, the use of a vocational expert is permitted to determine how a

7  claimant actually performed his work.  *Lewis*, 281 F.3d at 1083.

8       The record contains the testimony of Plaintiff and the vocational expert regarding the

9  exertion requirements of Plaintiff's position as an area manager.  The ALJ was not required to obtain

10  further evidence regarding how the work was performed generally in the national economy, because

11  the vocational expert properly classified the position by relying upon the *Dictionary of Occupational*

12  *Titles*.  Consequently, the ALJ did not err in her determination of the requirements of Plaintiff's past

13  relevant work under either SSR 82-61 or SSR 82-62, and was not required to further develop the

14  record.

15  B.   The ALJ evaluated Plaintiff's mental impairment in a proper manner.

16       Plaintiff argues the ALJ failed to address his "inability to handle stress," though Plaintiff and

17  his wife testified that he had this mental impairment.  (Doc. 14 at 30).  However, the ALJ

18  acknowledged Plaintiff's complaints, and determined Plaintiff's mental impairment was "not-

19  severe" at step two of his inquiry.  *See* AR at 12.  Plaintiff asserts the ALJ should have evaluated

20  Plaintiff's mental impairment in accord with Social Security Ruling 85-15.  (Doc. 14 at 30-31).

21       1.   Social Security Ruling 85-15

22       The Commissioner issued SSR 85-15 to clarify "policies applicable in cases involving the

23  evaluation of solely nonexertional impairments."  SSR 85-15, 1985 SSR LEXIS 20, at *3.  Thus, the

24  Ninth Circuit has held that SSR 85-15 is not applicable where a plaintiff claims both exertional and

25  nonexertional impairments.  *Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995), *cert. denied* 116 S.

26  Ct. 1356 (1996).  Furthermore, "mental impairments are generally considered to be nonexertional."

27  *Id.*, quoting SSR 85-15.

28

1    Here, Plaintiff alleges that his impairments include foot pain, and the ALJ concluded

2    Plaintif's physical impairments result in the inability to push and pull with his "right lower

3    extremity." AR at 13. Because Plaintiff raised both exertional and nonexertional impairments, SSR

4    85-15 does not apply. *See Roberts*, 66 F.3d at 183; *Sandgathe v. Chater*, 108 F.3d 687, 980-81 (9th

5    Cir. 1997) (holding SSR 85-15 was inapplicable because the claimant had exertional and

6    nonexertional impairments). Consequently, Plaintiff's argument that the ALJ should have evaluated

7    his mental impairment under SSR 85-15 is incorrect.

8        2.   ALJ's findings at step two

9    The inquiry at step two is a *de minimus* screening for severe impairments "to dispose of

10   groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) citing *Bowen*, 482 U.S.

11   137, 153-54 (1987). The purpose is to identify claimants whose medical impairment makes it

12   unlikely they would be disabled even if age, education, and experience are considered. *Bowen*, 482

13   U.S. at 153 (1987). At step two, a claimant must make a "threshold showing" that (1) he has a

14   medically determinable impairment or combination of impairments and (2) the impairment or

15   combination of impairments is severe. *Id.* at 146-47; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).

16   Thus, the burden of proof is on the claimant to establish a medically determinable severe

17   impairment. *Id.*; *see also Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009)

18   ("The burden of proof is on the claimant at steps one through four…").

19   An impairment, or combination thereof, is "not severe" if the evidence establishes that it has

20   "no more than a minimal effect on an individual's ability to do work." *Smolen*, 80 F.3d at 1290.

21   The Ninth Circuit explained: "The mere existence of an impairment is insufficient proof of a

22   disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). A medical diagnosis alone "does

23   not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities."

24   *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb. 16, 2011). For an impairment

25   to be "severe," it must significantly limit the claimant's physical or mental ability to do basic work

26   activities, or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1520(c).

27   ///

28   ///

16

1      *Objective medical evidence*

2           In this case, the ALJ determined Plaintiff's "mental impairments of depression and anxiety

3   do not cause more than minimal limitation in the claimant's ability to perform basic mental work

4   activities and are therefore non-severe." AR at 12.  As observed by the ALJ, the objective medical

5   evidence did not support a finding of a severe impairment: "The claimant has not had any regular or

6   ongoing mental health treatment, just pills prescribed by the claimant's primary care physician.  The

7   record does not document any mental status exam from a treating source during the period under

8   adjudication." AR at 12.  The ALJ noted, "State agency medical consultants have determined that

9   the claimant has no severe mental impairment and has only mild functional limitations."  *Id.*  Dr.

10  Bolshwing's evaluation was "benign," and Plaintiff scored within the average range on the standard

11  assessments of WAIS-III (IQ testing) and WMS-III (auditory and visual memory functioning tests).

12  *Id.* at 12; *see also* AR at 377, 396.  The ALJ cited the opinions of Dr. Starace and Dr. Fast, who

13  found that Plaintiff's mental impairment "is not causing any significant functional restrictions."  *Id.*

14  at 12, citing AR at 388, 405.  In addition, the ALJ stated, "[T]he Field Office teleclaim interviewer

15  noted no obvious difficulties."  *Id.* at 12.

16      *"Paragraph B" criteria*

17          The "paragraph B" criteria set forth in 20 C.F.R., Pt. 404, Subpart P, App. 1 are used to

18  evaluate the mental impairments of a claimant, and include: "[a]ctivities of daily living; social

19  functioning; concentration, persistence, or pace; and episodes of decompensation."  *See id*.  The

20  Regulations inform claimants:

21          If we rate the degree of your limitation in the first three functional areas as "none" or
            "mild and "none" in the fourth area, we will generally conclude that your impairment(s)

22          is not severe, unless the evidence otherwise indicates that there is more than a minimal
            limitation in your ability to do basic work activities.

23

24  20 C.F.R. § 1520a(d)(1).  Here, the ALJ concluded Plaintiff had "mild restriction" in activities of

25  daily living and "mild difficulties" with social functioning and concentration, persistence, or pace.

26  AR at 13.  Plaintiff had no episodes of decompensation.  *Id.*  As a result, the ALJ concluded

27  Plaintiff's mental impairment "is non-severe."  *Id.*

28

1   The ALJ supported her findings that Plaintiff's mental impairment was not severe with

2   objective medical evidence and the "paragraph B" criteria.  Also, the ALJ determined Plaintiff's

3   "mental impairments of depression and anxiety do not cause more than minimal limitation in the

4   claimant's ability to perform basic mental work activities."  *Id.* at 12; *see Smolen*, 80 F.3d at 1290.

5   Consequently, the ALJ concluded properly that Plaintiff's mental impairment was not severe at step

6   two of the inquiry.[9]

7   **C.  The ALJ erred in evaluating the medical opinions of Dr. Soria and Dr. Garfinkel.**

8   In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating

9   physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

10  examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821,

11  830 (9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight in

12  disability cases, but it is not binding on an ALJ when determining the existence of an impairment or

13  on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*,

14  881 F.2d 747, 751 (9th Cir. 1989).  Also, an examining physician's opinion is given more weight

15  than the opinion of a non-examining physician.  20 C.F.R. § 404.1527(d)(2).

16  A treating physician's opinion is not binding upon the ALJ, and may be rejected whether it is

17  contradicted by another but the ALJ "must present clear and convincing reasons for doing so."

18  *Magallanes*, 881 F.2d at 751; *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  On the other

19  hand, the ALJ must support his conclusion to reject the treating physician's opinion with "specific

20  and legitimate" findings that are supported by substantial evidence in the record.  *Lester*, 81 F.3d at

21  830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  When there is conflicting

22  medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v.*

23  *Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by

24  _____

25  [9] Notably, even if the Court were to find the ALJ erred in finding Plaintiff's mental impairment was "not severe"
    at step two, any error in designating specific impairments as severe at step two is harmless.  *See Burch v. Barnhart*, 400 F.3d

26  676, 682 (9th Cir. 2005) (holding that any error in omitting an impairment from the severe impairments identified at step two
    was harmless where the step was resolved in the claimant's favor).  Here, step two was resolved in Plaintiff's favor because

27  the ALJ found severe impairments including foot pain, coronary artery disease, and diabetes mellitus.  Moreover, the ALJ
    considered the physical limitations of Plaintiff's knee impairment in his determination that Plaintiff could perform light work.
    *See* AR at 15-16.  Thus, there was no prejudice to Plaintiff at step two.

28

1   the court when there is "more than one rational interpretation of the evidence." *Id.*; *see also Matney*

2   *v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must

3   resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not

4   substitute its judgment for that of the ALJ").

5        Plaintiff argues that the opinions of Dr. Soria and Dr. Garfinkel were not contradicted, and

6   that "the ALJ applied an incorrect legal standard" by rejecting the opinions with "specific and

7   legitimate reasons" as required with contradicted opinions, rather than with "clear and convincing

8   reasons." (Doc. 14 at 11-12).  However, Dr. Garfinkel and Dr. Soria opined Plaintiff had different

9   limitations.  For example, while Dr. Soria opined Plaintiff could stand and walk up to three hours,

10  Dr. Garfinkel found Plaintiff could do so for less than two hours.  *See* AR at 384, 485.  Also, Dr.

11  Soria stated Plaintiff suffered from "hand and leg/foot paresthesias," while Dr. Garfinkel said

12  Plaintiff had no manipulative limitations, and his hand strength was "5/5."  *Id.*  Thus, Dr. Soria's and

13  Dr. Garfinkel's opinions were contradictory such that the ALJ needed to provide "specific and

14  legitimate reasons" supported by substantial evidence, to satisfy the obligation to provide "clear and

15  convincing reasons" for rejecting the opinions.  *See Lester*, 81 F.3d at 830.

16       1.  Dr. Soria

17       The ALJ rejected Dr. Soria's opinions that Plaintiff's "hand use was limited due to

18  neuropathy and he is disabled."  AR at 14.  The ALJ considered "the totality of evidence, including

19  Dr. Soria's own records and assessments" in making this determination, and rejected Dr. Soria's

20  opinion for the following reasons:

21       First, his opinion is not well supported by medically acceptable clinical and laboratory
         diagnostic techniques.  His own records reflect objective testing revealed no
22       abnormalities that were not being successfully treated with conservative treatment
         modalities. . . . Second, Dr. Soria's opinion is not supported by the other evidence of
23       record, including the records of the claimant's other treating and consulting sources.

24  *Id.*  Further, the ALJ found Dr. Soria's opinion was based upon Plaintiff's subjective complaints,

25  rather than the objective evidence.  *Id.*  Thus, the ALJ opined the opinion "is not deserving of the

26  great weight generally accorded to the opinions of a treating physician, and is rejected."  *Id.*

27       Notably, the Social Security Administration addressed the reasons set forth by ALJ in SSR

28  96-2p, which explains the weight to be given to medical opinions:

1

2

3

4

5

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," <u>not that the opinion should be rejected</u>. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

6   SSR 96-2p, 1996 SSR LEXIS 9, at *9-10 (emphasis added); *see also Orn v. Astrue*, 495 F.3d 625,

7   630-31 (9th Cir. 2007).  Seemingly, the reasons set forth by the ALJ come directly from this Ruling,

8   however, the ALJ failed to follow the procedure set forth in it.  Rather than affording Dr. Soria's

9   opinion rather less than controlling weight, the ALJ rejected the opinion.  Further, the ALJ failed to

10  weigh Dr. Soria's opinion using several of the factors found in 20 C.F.R. § 404.1527, which requires

11  the ALJ to consider the length of the treatment relationship, frequency of examination, nature and

12  extent of the treatment relationship.  Instead, the ALJ considered only supportability ("relevant

13  evidence to support an opinion, particularly medical signs and laboratory findings") and consistency

14  with the record as a whole.  *See* 20 C.F.R. § 404.1527.

15       Defendant argues that the ALJ properly rejected Dr. Soria's opinion because the treatment

16  notes did not reveal abnormalities and the opinion was inconsistent with the clinical findings.  (Doc.

17  15 at 17-18).  A medical opinion may be rejected when it is "unsupported by the record as a whole."

18  *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003).  Likewise, an

19  opinion may be rejected where there is incongruity between a treating doctor's assessment and his

20  own medical records.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  Dr. Soria's

21  treatment notes do not reveal any clinical findings or objective tests supporting that contradict his

22  opinion that Plaintiff could not stand or walk for more than three hours, or sit for more than six

23  hours.

24       Notably, the ALJ did not set forth or discuss the conflicting clinical evidence.  Though the

25  ALJ stated that Dr. Soria's opinion was not supported by the records of "other treating and

26  consulting sources," the ALJ neither identifies those sources nor their findings.  *See* AR at 15.  When

27  an ALJ disregards a treating physician's opinion, the ALJ must "set out a detailed and thorough

28  summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making

20

1  findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).  Here, the ALJ offered only her

2  conclusions without citation to supporting specific, legitimate reasons supported by substantial

3  evidence.  This is insufficient.

4      2.  Dr. Garfinkel

5      The ALJ stated she gave Dr. Garfinkel's statement "great weight."  AR at 14.  However, the

6  ALJ rejected the portion of Dr. Garfinkel's opinion that Plaintiff "cannot stand/or walk two hours

7  per day."  *Id.*  In support of this rejection, the ALJ cited the opinion of Dr. Fast, a non-examining

8  physician, who opined the activities reported by Plaintiff to Dr. Garfinkel "require at least sedentary

9  . . . stand and/or walk capability."  *Id.*, citing AR at 408.

10      An ALJ may reject the opinion of an examining physician, if contradicted by a non-

11  examining physician, with "specific and legitimate reasons that are supported by substantial evidence

12  in the record."  *Moore v. Comm'r of the Soc. Sec. Admin*, 278 F.3d 920, 924 (9th Cir. 2002), citing

13  *Lester*, 81 F.3d at 830-31.  However,"the contrary opinion of a non-examining medical expert does

14  not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's

15  opinion."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001), citing *Magallanes*, 881 F.2d

16  at 752; *see also Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 199) ("The nonexamining

17  physicians' conclusion, with nothing more, does not constitute substantial evidence, particularly in

18  view of the conflicting observations, opinions, and conclusions of an examining physician.").

19      The lone reason the ALJ provided for rejecting Dr. Garfinkel's opinion was the contrary of

20  opinion of Dr. Fast, which was neither a specific, legitimate reason nor substantial evidence that

21  would justify doing so. Consequently, the ALJ erred in rejecting Dr. Garfinkel's opinion.

22  D.  The ALJ erred in evaluating the credibility of Plaintiff's testimony.

23      In determining credibility, an ALJ must inquire whether objective medical evidence shows an

24  underlying impairment "which could reasonably be expected to produce the pain or other symptoms

25  alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007), quoting *Bunnell v.*

26  *Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991).  Here, the ALJ found Plaintiff's "medically

27  determinable impairments could reasonably be expected to cause the alleged symptoms."  AR at 14.

28  However, the ALJ determined Plaintiff's "statements concerning the intensity, duration and limiting

1  effects of [his] symptoms are not entirely credible." *Id.* at 15.  Plaintiff asserts the ALJ "committed

2  reversible error" by discounting Plaintiff's credibility and relied upon improper legal standards.

3  (Doc. 14 at 18).

4          An adverse finding of credibility must be based on clear and convincing evidence where there

5  is no affirmative evidence of the claimant is malingering and "the record includes objective medical

6  evidence establishing that the claimant suffers from an impairment that could reasonably produce the

7  symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160

8  (9th Cir. 2008).  An ALJ may not discredit testimony as to the severity of symptoms only because it

9  is unsupported by objective medical evidence.  *See Bunnell*, 947 F.2d at 347-48.  In addition, an ALJ

10  "must identify what testimony is not credible and what evidence undermines the claimant's

11  complaints." *Lester v. Chater*, 81 F.3d 821, 834; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th

12  Cir. 1993).  Credibility findings "must be sufficiently specific to allow a reviewing court to conclude

13  the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the

14  claimant's testimony." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004).

15          1.   The ALJ's determination

16          In this case, the ALJ determined Plaintiff's testimony "concerning the intensity, and limiting

17  effects" of his symptoms was "not entirely credible."  AR at 15.  The ALJ set forth a number of

18  reasons in support of her conclusion.  *Id.*  Specifically, the ALJ stated:

19          First, the objective medical evidence does not show pathology reasonably likely to cause
            the debilitating symptoms alleged.  He has no longitudinal mental health treatment.
20          Second, the claimant's treatment has been routine or conservative in nature.  Third, the
            record reflects some gaps in treatment, further indicating that the claimant's symptoms
21          and limitations have not been as serious as has been alleged in connection with this
            application and appeal.  Fourth, [t]he claimant presents with an extensive history of
22          polysubstance abuse (methamphetamine, cocaine, and alcohol) until May 2007 [citation].
            Fifth, there is not twelve month period where the claimant's limitations provided
23          disability.  Sixth, the claimant is not taking medications of a type and dosage consistent
            with his allegations [citation].  Seventh, the record does not indicate that the claimant
24          suffers from debilitating side effects from his medication when complaint.  The record
            shows that claimant has a longitudinal history of noncompliance with medications and
25          medical advice [citation] . . . Eighth, the claimant's allegations of pain and limitation are
            excessive and not consistent with treatment and medical findings.  Ninth, no treating or
26          examining physician has opined that the claimant is totally and permanently disabled
            from all work.  Tenth, the claimant was able to participate in the administrative hearing
27          and respond to the questioning without any apparent difficulties.  Eleventh, concerning
            his activities of daily living, the claimant has described and testified to daily activities

28

                                                      22

1    which are not limited to the extent one would expect, given the complaints of disabling
2    symptoms and limitations [citation].

3    AR at 15 (internal citations omitted).  Plaintiff asserts that these reasons do not meet the standards

4    required by the Ninth Circuit because many are "simply references to the objective evidence, and

5    some are the ALJ's unsupported layperson conclusions that are contradicted by the physicians of

6    record."  (Doc. 14 at 19).

7        *Objective medical evidence*

8        Plaintiff argues consideration of the objective medical evidence and his mental health

9    treatment "are not valid reasons for rejecting Plaintiff's allegations." (Doc. 14 at 19).  Also, Plaintiff

10   asserts the ALJ's use of the objective medical evidence to reject Plaintiff's testimony was not proper

11   because "the ALJ must identify specific evidence which shows that specific testimony is not

12   credible."  *Id.*, citing *Dodrill*, 12 F.3d at 918.

13       Generally, "conflicts between a [claimant's] testimony of subjective complaints and the

14   objective medical evidence in the record" can constitute "specific and substantial reasons that

15   undermine . . . credibility."  *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir.

16   1999).  The Ninth Circuit stated, "While subjective pain testimony cannot be rejected on the sole

17   ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a

18   relevant factor in determining the severity of the claimant's pain and its disabling effects."  *Rollins v.*

19   *Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barchart*, 400 F.3d 676, 681 (9th

20   Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain

21   testimony, it is a factor that the ALJ can consider in his credibility analysis."); SSR 96-7p, 1996 SSR

22   LEXIS 4, at *2-3 (the ALJ "must consider the entire case record, including the objective medical

23   evidence" in determining credibility, but statements "may not be disregarded solely because they are

24   not substantiated by objective medical evidence").

25       Here, the ALJ did not base her decision solely on the fact that the medical record did not

26   support the degree of symptoms alleged by Plaintiff.  Thus, the objective medical evidence was a

27   relevant factor in determining Plaintiff's credibility.  However, in citing to the medical evidence as

28   part of a credibility determination, it is not sufficient for the ALJ to make a general statement that the

testimony is contradicted by the record.  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination").  Rather, the ALJ "must state which pain testimony is not credible and what evidence suggests the claimants are not credible."  *Dodrill*, 12 F.3d at 918; *see also Holohan*, 246 F.3d at 1208 ("the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony").  The ALJ did not fulfill this obligation.

The ALJ stated "the objective medical evidence does not show pathology reasonably likely to cause the debilitating symptoms alleged" and found Plaintiff's testimony regarding his pain and limitations was "not consistent with treatment and medical findings."  AR at 15.  Despite these conclusions, the ALJ neither identified the alleged symptoms, nor support these statements with citations to the medical record or a specific discussion of the facts.  Likewise, the ALJ stated the medical records did not establish a "twelve month period where the claimant's limitations provided disability."  AR at 15.  However, "the question of whether the medical evidence established that Plaintiff was precluded from working for a continuous 12-month period relates to the ultimate determination of disability, and is not a proper basis for rejecting credibility."  *Rivera v. Astrue*, 2009 U.S. Dist. LEXIS 105919, at *8 (C.D. Cal. Nov. 10, 2009).  Consequently, these were not "clear and convincing" reasons for rejecting Plaintiff's testimony.

*Conservative treatment and medications*

The ALJ stated Plaintiff received "routine or conservative" treatment, and he was "not taking medications of a type and dosage consistent with his allegations."  AR at 15.  In assessing Plaintiff's credibility about his symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication."  20 C.F.R. § 404.1529(c).  Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding.  *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).  The Ninth Circuit has "indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."  *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).

24

Plaintiff argues this case is distinguishable from *Parra v. Astrue*, and that "the court's discussion in *Parra* is *obiter dictum*" because "the Ninth Circuit expressly noted that 'the ALJ did not find that Parra lacked credibility.'"  (Doc. 18 at 10, quoting *Parra*, 481 F.3d at 750).  However, in *Parra*, the ALJ "discounted some of Parra's subjective testimony regarding his . . . pain." *Parra*, 481 F.3d at 750.  The Court found that "to the extent this constitutes a rejection of Parra's testimony, the ALJ provide[d] clear and convincing reasons for doing so," including the conservative treatment received from doctors.  *Id.*  Similarly, here, the ALJ found Plaintiff's testimony was "not entirely credible" with his testimony regarding the "intensity, persistence, and limiting effects" of his symptoms.  AR at 14.  Also, the ALJ noted Dr. Soria's treatment records "reflect objective testing revealed no abnormalities that were not being successfully treated with conservative treatment modalities." *Id.*

On the other hand, the ALJ does not cite to the treatment Plaintiff received that was "routine or conservative," nor did the ALJ state with specificity how Plaintiff's treatment was inconsistent with his allegations.  Notably, Plaintiff had surgery on his right foot in November 2006, which Dr. Garfinkel noted had not healed when Plaintiff was wearing a walking cast in August 2007.  AR at 211, 382.  In addition, Plaintiff had coronary artery surgery in which he received a stent in May 2007.  *Id.* at 161-62.  These treatments are seemingly neither routine nor conservative in nature.  *See Ritchotte v. Astrue*, 281 Fed. Appx. 757, 759 (9th Cir. 2008) (rejecting the ALJ's conclusion that the claimant's treatment was too conservative where he had surgery and the prognosis was guarded); *see also Walters v. Astrue*, 2010 U.S. Dist. LEXIS 55698, at *37-38 (E.D. Cal. May 10, 2010) (contrary to the ALJ's conclusion that Plaintiff received conservative treatment, "the record reflects that Plaintiff twice underwent surgery").  Therefore, the medication and treatment Plaintiff received were not clear and convincing reasons for rejecting Plaintiff's testimony.

*Gaps in treatment*

An ALJ may determine a claimant's statements are "less credible if the level or frequency of treatment is inconsistent with the level of complaints."  SSR 96-7p, 1996 SSR LEXIS 4, at *21.  Thus, minimal treatment may suggest a lower level of pain and functional limitations than a claimant alleges.  *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *see also Fair v. Bowen*, 885

1    F.2d 597, 603 (9th Cir. 1989) ("unexplained, or inadequately explained, failure to seek treatment . . .

2    can cast doubt on the sincerity of the claimant's pain testimony").  When rejecting testimony for

3    gaps in treatment, an ALJ "must not draw inferences about an individual's symptoms and their

4    functional effects . . . without first considering any explanations that the individual may provide, or

5    other information in the case record, that may explain infrequent or irregular medical visits or failure

6    to seek treatment."  SSR 96-7p, 1996 SSR LEXIS 4, at *22.  For example, the Ninth Circuit has held

7    gaps in treatment do not constitute a clear and convincing reason for discounting credibility where

8    the claimant lacked the financial ability to pay for treatment.  *Orn*, 495 F.3d at 638 (9th Cir. 2007).

9        In this case, the ALJ does not identify the "gaps" in treatment upon which she relied.

10   Notably, the medical record reflects only intermittent breaks in Plaintiff's visits to Dr. Soria's office,

11   with the longest being from November 20, 2006 (his pre-operation visit) to May 23, 2007 (for post-

12   hospitalization follow up).  *See* AR at 208-11.  On January 2, 2008, Dr. Soria noted Plaintiff "wants

13   to make some med changes due to cost."  *Id.* at 462.  On February 6, 2008, Dr. Soria indicated

14   Plaintiff had "no insurance now; cannot do labs."  *Id.* at 469.  Moreover, Plaintiff testified he had not

15   been able to receive treatment from a psychiatrist due to the cost.  *Id.* at 36.  Given these

16   considerations, that Plaintiff had "gaps in treatment" is not a clear and convincing reason for

17   rejecting Plaintiff's testimony.

18        *History of polysubstance abuse*

19        Plaintiff argues the ALJ should not have considered his former substance abuse in

20   determining credibility.  (Doc. 14 at 21).  A claimant's lack of candor regarding substance abuse is a

21   clear and convincing reason to reject the claimant's testimony.  *See, e.g., Verduzco v. Apfel*, 188 F.3d

22   1082, 1090 (9th Cir. 1999) (the ALJ "noted that Verduzco's testimony and various statements

23   regarding his drinking were not consistent," which the Court found was a clear and convincing

24   reason for discounting credibility); *Thomas*, 278 F.3d at 959 (upholding a credibility determination

25   where the claimant "present[ed] conflicting information about her drug and alcohol use").

26        Here, there is no evidence of inconsistent statements regarding Plaintiff's prior substance

27   abuse.  To the contrary, the document the ALJ cites in support of Plaintiff's substance abuse contains

28   Plaintiff's self-report of his "history of significant polysubstance abuse," beginning at age 16, to Dr.

von Bolshwing, though the record does not indicate the substance abuse continued to May 2007, as

the ALJ stated.  *See* AR at 277-78.  Regardless, there must be more than a history of substance abuse

to discredit a claimant's testimony.  *See Woodsum v. Astrue*, 711 F. Supp. 2d 1239, 1262 (W.D.

Wash 2010) ("discounting plaintiff's credibility because of her substance abuse . . . history was

improper, given that it bears little relevance to plaintiff's tendency to tell the truth"); *Johnson v.*

*Barnhart*, 312 F. Supp. 2d 415, 429 (W.D.N.Y. 2003) (holding SSR 96-7p requires more than

"history of alcoholism and drug abuse" to discredit the plaintiff's testimony).  In light of the fact the

ALJ did not find Plaintiff lacked candor regarding his substance abuse, and cited no evidence

indicating prior inconsistent statements, Plaintiff's "history of polysubstance abuse" is not a clear

and convincing reasons for rejecting his testimony.

*Opinions of physicians regarding disability*

The ALJ discounted Plaintiff's testimony because no treating or examining physician found

Plaintiff was "totally and permanently disabled from all work."  AR at 10.  However, the

determination of whether a claimant is disabled is an issue reserved for the Commissioner.  20

C.F.R. § 404.1527(e).  Moreover, the ALJ appears to disregard Dr. Soria's opinion that "the medical

opinions for which [he] treated the claimant preclude [Plaintiff] from performing *any full-time work*

*at any exertion level*, including the sedentary level."  *See* AR at 485 (emphasis added).  Therefore,

this was not a valid consideration by the ALJ.

*Noncompliance with treatment*

Plaintiff does not argue he complied with treatment, but rather that the ALJ should not have

considered his failure to comply with treatment as part of the credibility determination, and the ALJ

should have offered "an opportunity to comply with prescribed treatment or show justifiable cause

for non-compliance."  (Doc. 14 at 19, 26-28).

The Ninth Circuit has stated, "[A]n unexplained, or inadequately explained, failure to . . .

follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain

testimony.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Therefore, noncompliance with a

prescribed course of treatment is clear and convincing reason for finding a Plaintiff's subjective

complaints lack credibility.  *Id.*; *see also Bunnell v. Sullivan*, 947 F.2d at 346.

1   The ALJ found Plaintiff had a "longitudinal history of noncompliance with medications and

2   medical advice."  AR at 15, citing AR at 340 (On May 17, 2007, Dr. Soria noted Plaintiff "has a long

3   history of noncompliance with medications and medical advice.").  Moreover, this assessment is

4   supported by a number of earlier treatment notes from Dr. Soria.  For example, in July 2004, Dr.

5   Soria noted: "Compliance with treatment has been poor; he does not follow a diet and exercise

6   regimen and does not follow-up as directed" and in August 2004, Dr. Soria found Plaintiff was

7   complying with his medication, but would not check his blood sugars on a finger stick and would

8   administer regular insulin.  *Id.* at 251, 253.  Likewise, in July 2006, Dr. Soria noted Plaintiff had not

9   complied with his medication, but his blood sugars improved when compliant with his medication in

10  April.  *Id.* at 220.  Therefore, the ALJ's conclusion that Plaintiff had a history of not complying with

11  medication was supported by medical evidence, and a clear and convincing reason for rejecting

12  Plaintiff's testimony.

13       *ALJ's personal observations*

14       When an ALJ includes personal observations of a claimant during the hearing, the decision is

15  not improper if other evidence supports the determination.  *Nyman v. Heckler*, 779 F.2d 528, 531

16  (9th Cir. 1986); *Drouin v. Sullivan,* 966 F.2d 1255, 1258-59 (9th Cir. 1992) (observations of ALJ

17  during the hearing, along with other evidence, is substantial evidence for rejecting testimony).  Here,

18  the ALJ stated Plaintiff "was able to participate . . . and respond to the questioning without any

19  apparent difficulties."  AR at 15.  However, the ALJ identified did not identify "other" evidence that

20  was consistent with his personal observation and did not address how Plaintiff's ability to participate

21  in the hearing discredited Plaintiff's evidence related to his claimed mental impairment, a claimed

22  physical impairment or both.[10]  Thus, the personal observation of the ALJ was not a clear and

23  convincing reason to support the adverse credibility determination.

24  ///

25

---

26       [10] Defendant argues the ALJ's personal observation that Plaintiff was able to participate at the hearing "is significant
    since Plaintiff alleged his ability to concentrate was a primary disability factor."  (Doc. 15 at 22).  However, the Court may

27  not accept post hoc explanations, and cannot affirm on grounds not invoked by the ALJ.  *See Connett v. Barnhart*, 340 F.3d
    871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts. [Citation.] It was an error for the district

28  court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss.") (internal citations omitted).

1      *Activities of daily living*

2          When a claimant spends a substantial part of the day "engaged in pursuits involving the

3      performance of physical functions that are transferable to a work setting, a specific finding as to this

4      fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec.*

5      *Admin.*, 169 F.3d 595, 600 (9th Cir. 1999), citing *Fair*, 885 F.2d at 603.  For example, a claimant's

6      ability to cook, clean, do laundry and manage finances is sufficient to support an adverse finding find

7      of credibility.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch*,

8      400 F.3d at 680 (the claimant's activities "suggest she is quite functional.  She is able to care for her

9      own personal needs, cook, clean and shop.  She interacts with her nephew and boyfriend. She is able

10     to manage her own finances…").  Likewise, an ALJ may conclude "the severity of . . . limitations

11     were exaggerated" when a claimant exercises, gardens, and participates in community activities.

12     *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).  However, an ALJ must

13     make a specific finding relating to the transferability of the activities to a workplace to refute a

14     plaintiff's allegations of disability.  *Orn*, 495 F.3d at 639.

15         Plaintiff argues the ALJ failed to make a specific finding that his daily activities were

16     transferable to a work setting: "The ALJ has identified nothing that Plaintiff does that requires

17     sedentary exertion on a sustained, full time basis."  (Doc. 14 at 24).  Plaintiff argues also that "the

18     ALJ made no substantive inquiry concerning the nature, duration, and frequency of Plaintiff's

19     alleged activities."  *Id.*  Therefore, Plaintiff asserts his daily activities do not have any bearing on his

20     credibility.  *Id.* at 25.

21         Defendant argues that the law and evidence in the record support the ALJ's reasoning for

22     rejecting Plaintiff's credibility.  (Doc. 15 at 22).  Specifically, Defendant states: "Plaintiff reported

23     that he was able to engage in household chores such as washing dishes, doing laundry, vacuuming

24     and cleaning the floors and that he was able to shop (AR 121-22, 376) as did his wife (AR 130-32)."

25     In addition, Defendant argues the ALJ did not conclude Plaintiff's activities "were consistent with

26     work tasks, but that they were inconsistent with his alleged limitations."  *Id.* (emphasis omitted),

27     citing *Stubbs- Danielson*, 539 F.3d at 1175; *Curry v. Sullivan*, 925 F.2d 1125, 1130 (9th Cir. 1990).

28         The ALJ noted that Plaintiff reported the ability "to 25 minutes and then resume walking

29

1    after a five minute break . . . [and] to do some housework, including vacuuming and cleaning the

2    kitchen floor, and he goes shopping." AR at 14, citing AR at 119-26. The Ninth Circuit found the

3    ability to "take care of . . . personal needs, prepare easy meals, do light housework, and shop for

4    some groceries . . . may be seen as inconsistent with the presence of a condition which would

5    preclude all work activity." *Curry*, 925 F.2d at 1130. The ALJ considered Plaintiff's admitted

6    activities of daily living, which were comparable to the activities of the claimant in *Curry*, and found

7    Plaintiff's activities were inconsistent with his complaints of completely disabling symptoms and

8    limitations.

9           However, the Ninth Circuit has made clear that the fact a claimant engages in normal daily

10   activities "does not in any way detract from [his] credibility as to [his] overall disability." *Vertigan v.*

11   *Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). The Court continued, "One does not need to be 'utterly

12   incapacitated' in order to be disabled." *Id.*, quoting *Fair*, 885 F.2d at 603. Rather, an ALJ must

13   make a determination as to whether daily activities are transferrable to a workplace. *See, e.g.,*

14   *Stubbs-Danielson*, 539 F.3d at 1175 (the ALJ determined claimant's activities of daily living "tend to

15   suggest that the claimant may still be capable of performing the basic demands of competitive,

16   remunerative, unskilled work on a sustained basis"). Here, the ALJ failed establish Plaintiff's

17   limited activities could be transferred to a work setting, or find that Plaintiff spent a "substantial"

18   part of his day engaged in such activities. *See Orn*, 495 F.3d at 639 (the ALJ erred in failing to

19   "meet the threshold for transferable work skills, the second ground for using daily activities in

20   credibility determinations"); *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did

21   not constitute convincing evidence that the claimant could function regularly in a work setting).

22   Moreover, the Ninth Circuit opined, "Daily household chores and grocery shopping are not activities

23   that are easily transferable to a work environment." *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th

24   Cir. 2008). Consequently, Plaintiff's activities of daily living did not constitute clear and convincing

25   evidence sufficient to discount his credibility.

26          2. The ALJ's reliance on invalid reasons was not harmless error.

27   When some of an ALJ's reasons for an adverse credibility determination are not supported by the

28   record or are legally insufficient, the Court must consider whether the reliance on invalid reasons

was a harmless error. *See Batson*, 359 F.3d at 1195-97 (applying a harmless error standard where the credibility finding was invalid).  The Ninth Circuit stated, "So long as there remains 'substantial evidence supporting the ALJ's conclusion's on credibility' and the error 'does not negate the validity of the ALJ's ultimate credibility conclusion,' such [error] is deemed harmless." *Carmickle*, 533 F.3d at 1162, quoting *Batson*, 359 F.3d at 1197.

Here, only one of the eleven reasons stated by the ALJ was legally sufficient but even this reason was not supported by specific citation to the medical record.  Further, as set forth above, the ALJ failed to reject the medical opinions in the record, and her underlying decision that Plaintiff is not disabled is not supported by substantial evidence.  Therefore, the ALJ's reliance on invalid reasons for rejecting Plaintiff's testimony was not harmless error.

E.   The ALJ was not required to evaluate Plaintiff's treatment noncompliance under SSR 82-59.

An impairment that can be controlled by treatment or medication is not considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).  Under the Regulations of the Social Security Administration, a claimant is cautioned: "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  20 C.F.R. § 404.1530(a).  If a claimant fails to follow the prescribed treatment without an acceptable reason, the Commissioner "will not find [the claimant] disabled."  20 C.F.R. § 404.1530(b); *see also Orn v. Astrue*, 495 F.3d 625, 636-37 (9th Cir. 2007).  The policy of the Social Security Administration dictates that to find an individual does not qualify for benefits due to a failure to follow treatment, the following conditions must exist:

> 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . . ; and
>
> 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
>
> 3. Treatment which is clearly expected to restore capacity to engage in any SGA . . . has been prescribed by a treating source; and
>
> 4. The evidence of record discloses that there has been a refusal to follow prescribed treatment.

SSR 82-59, 1982 SSR LEXIS 25, at *2.  Additionally, a claimant "should be given the opportunity to fully express the specific reason(s) for not following the prescribed treatment."  *Id.* at *5.

1    In the credibility determination, the ALJ stated, "Since there were no allowable reasons

2 offered for noncompliance with medication and medical advice, the claimant can be denied benefits

3 based on this regulation." AR at 15.  Plaintiff argues that this reason "is, but itself, sufficient to

4 warrant this Court reversing her decision and remanding this case for immediate payment of benefits

5 under Social Security Ruling 82-59." (Doc. 14 at 26).  Plaintiff asserts the ALJ failed to give

6 Plaintiff an opportunity to comply with prescribed treatment.  *Id.* at 28.  Further, Plaintiff argues,

7 "The ALJ rejected Plaintiff's allegations on the grounds that he failed to follow prescribed treatment.

8 However, if Plaintiff's allegations are credited—instead of being rejected—he would be found

9 disabled." (Doc. 18 at 2).  Therefore, Plaintiff asserts SSR 82-59 is applicable, because the claimant

10 would be disabled, but for his failure to follow treatment.  *Id.*

11    The Ninth Circuit held the procedures set forth in SSR 82-59 "only apply to claimants who

12 would otherwise be disabled within the meaning of the Act." *Roberts v. Shalala*, 66 F.3d 179, 183

13 (9th Cir. 1995).  To have the protections of SSR 82-59, an ALJ must "premise the denial of benefits

14 solely on [a claimant's] failure to follow prescribed treatment." *Id.*; *see also Lockwood v. Comm'r*

15 *Soc. Sec. Admin.*, 397 Fed. App'x 288, 290 (9th Cir. 2010) (holding SSR 82-59 was inapplicable

16 because "[t]he ALJ did not use noncompliance as an independent basis for denial").  Therefore, for

17 SSR 82-59 to be applicable, an ALJ must first determine a claimant is disabled, and proceed to deny

18 benefits because a claimant failed to follow treatment that was expected to restore the claimant's

19 ability to do work within the national economy.

20    Similar to the ALJ in *Roberts*, the ALJ did not determine Plaintiff was disabled, or premise

21 denial of benefits solely upon Plaintiff's failure to comply with treatment.  *See* AR at 17; *Roberts*, 66

22 F.3d at 183.  Rather, the ALJ determined Plaintiff had the ability to perform his past relevant work

23 given his residual functional capacity.  AR at 16.  In addition, the ALJ opined, "[E]ven if the

24 claimant could not return to his past relevant work as an area manager, a finding of 'not disabled'

25 would . . . be appropriate" because Plaintiff could work in the national economy because his

26 limitations "have little to no effect on the whole occupational basis of sedentary level work." *Id.* at

27 17.  Plaintiff's failure to comply with his treatment did not form the basis of the denial of his

28 disability insurance benefits, but rather was one of the many factors the ALJ purported to consider as

part of the credibility determination.  *See id.* at 15.  Consequently, the ALJ was not required to apply the procedures mandated by SSR 82-59.

F.   The ALJ erred in evaluating the lay witness testimony.

The ALJ must consider statements of "non-medical sources" including spouses, parents, and other relatives in determining the severity of a claimant's symptoms.  20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work.").  As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment."  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted).  To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness.  *Dodrill*, 12 F.3d at 919.

Addressing the statement of Plaintiff's wife, Lisa Kimzey, the ALJ opined that "the accuracy of her report is questionable," because she was not medically trained to make observations.  AR at 15.  In addition, the ALJ stated:

> [B]y virtue of the relationship as the claimant's spouse, Ms. Kimzey cannot be considered a disinterested third party witness whose report would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations he alleges.  Most importantly, significant weight cannot be given to Ms. Kimzey's report because it, like the claimant's reports and testimony, is simply not consistent with the preponderance of the opinions and observations by medical doctors in this case.

*Id.*  For these reasons, the ALJ rejected the lay witness statement, and concluded that the report did not establish Plaintiff was disabled.  *Id.*

Plaintiff contends these were not legitimate reasons for the ALJ to reject the lay witness statement.  (Doc. 14 at 28-29).  First, Plaintiff argues that "[i]t is irrelevant to the credibility of Mrs. Kimzey that she is married to the claimant.  *Id.* at 29.  Plaintiff argues also the ALJ's comment that she is not a medical source is also irrelevant, though Mrs. Kimzey is a nurse.  *Id.*  Further, Plaintiff asserts the report "is consistent with the preponderance of the opinions and observations by medical doctors in this case."  *Id.* at 29-30.

1    Defendant argues that the ALJ provided germane reasons for dismissing the report, including

2    that the report was inconsistent with medical evidence.  (Doc. 15 at 24, citing *Bayliss v. Barnhart*,

3    427 F.3d 1211, 1218 (9th Cir. 2005).  Also, Defendant asserts that an ALJ may reject lay witness

4    statements because they were "based solely upon her observations" or because she was not a

5    disinterested witness.  *Id.*, citing *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); *Greger v.*

6    *Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

7    Rejecting lay witness testimony on the grounds that the witness is a spouse and, therefore, an

8    interested in party in the action, is not a ground for rejecting the testimony.  *See Valentine*, 574 F.3d

9    at 694.  The Ninth Circuit explained:

10   Such a broad rationale for rejection contradicts our insistence that, regardless of whether
     they are interested parties, "friends and family members in a position to observe a
11   claimant's symptoms and daily activities are competent to testify as to [his or] her
     condition." *Dodrill,* 12 F.3d at 918-919.  Although spouses do not usually observe each
12   other at work, they do usually observe each other at home.  Thus, insofar as the ALJ
     relied on characteristics common to all spouses, she ran afoul of our precedents.

13
     This does not mean an ALJ must accept the testimony of the spouse who knows little
14   about a claimant's functional capacity.  But the ALJ must explain such ignorance in the
     individual case.  Similarly, evidence that a specific spouse exaggerated a claimant's
15   symptoms *in order* to get access to his disability benefits, as opposed to being an
     "interested party in the abstract," might suffice to reject that spouse's testimony.

16

17   *Id.*  Here, the ALJ did not find Mrs. Kimzey had little opportunity to observe Plaintiff, or that Mrs.

18   Kimzey exaggerated his symptoms for the purpose of getting access to his disability benefits.

19   Consequently, the fact that Mrs. Kimzey is Plaintiff's spouse and, therefore, "cannot be considered a

20   disinterested third party witness" is not a ground for rejecting her testimony.

21   Moreover, this case is distinguished from *Bayliss*, in which the plaintiff argued the ALJ

22   improperly rejected *portions* of lay witnesses' testimony.  *Bayliss*, 427 F.3d at 1211.  There, the ALJ

23   accepted testimony of the claimant's family and friends "that was consistent with the record of [her]

24   activities and the objective evidence in the record; he rejected portions of their testimony that did not

25   meet this standard."  *Id.*  The Court found "inconsistency with medical evidence is one [germane]

26   reason" because "rejection of certain testimony was supported by substantial evidence."  *Id.*

27   However, in this case, the ALJ dismissed Mrs. Kimzey's statement in its entirety.  Furthermore, the

28

ALJ failed to state which statements were not consistent with medical opinions.[11]  Thus, unlike in

*Bayliss*, that the testimony was "not consistent with the preponderance of the opinions and

observations by medical doctors" is not a germane reason for rejecting the lay witness report.

### G.   The ALJ did not pose a proper hypothetical question to the vocational expert

An ALJ may call a vocational expert "to testify as to (1) what jobs the claimant, given his or

her functional capacity, would be able to do; and (2) the availability of such jobs in the national

economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).   When eliciting testimony from

the VE, the ALJ may pose "hypothetical questions to the vocational expert that 'set out all of the

claimant's impairments' for the vocational expert's consideration." *Id.*, quoting *Gamer v. Sec'y of

Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987).   Limitations supported by

substantial evidence must be included in the question.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880,

886 (9th Cir. 2006); *Osenbrock*, 240 F.3d at 1163-65.   "If the assumptions in the hypothetical are not

supported by the record, the opinion of the vocational expert that the claimant has a residual working

capacity has no evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

In this case, the hypothetical set forth by the ALJ was based upon the opinion of Dr. Fast.

AR at 38.   However, the ALJ failed to properly reject the opinions of Dr. Soria and Dr. Garfinkel in

assessing Plaintiff's limitations, and the opinion of Dr. Fast is not substantial evidence to support the

limitations given by the ALJ.  *See Tonapetyan*, 242 F.3d at 1149; *Pitzer*, 908 F.2d at 506 n.4.   It

follows that the testimony of a vocational expert who responds to a question based upon the

limitations set forth by a non-examining physician "is not substantial evidence upon which to base a

denial of benefits." *Shontos v. Barnhart*, 328 F.3d 481, 427 (8th Cir. 2003).   Therefore, the ALJ did

not pose a proper hypothetical question, and the testimony of the vocational expert cannot constitute

substantial evidence to support the ALJ's findings.

---

[11] Notably, this reason is the same as one given for rejecting Plaintiff's testimony.  When an ALJ states clear and convincing reasons for rejecting the subjective complaints of a plaintiff, and third party testimony is "similar to such complaints," the reasons set forth for rejecting the plaintiff's testimony may be germane reasons for rejecting the similar testimony of the third party.  *Valentine v. Comm'r of Soc. Sec. Admin*, 574 F.3d 685, 694 (9th Cir. 2009).

Here, the ALJ failed to set forth conflicting objective medical evidence as a clear and convincing reason for rejecting Plaintiff's complaints, because the findings were not supported by substantial evidence.  Likewise, this is not a germane reason for rejecting the lay witness testimony.

H.   Remand is appropriate in this matter.

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004), citing *INS v. Ventura*, 537 U.S. 12, 16 (2002). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). An award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. *Varney v. Sec'y of Heath & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ did not reject the opinions of Plaintiff or the lay witness in a proper manner. In addition, the ALJ failed to properly evaluate the medical opinions of Dr. Soria and Dr. Garfinkel. Consequently, the ALJ did not pose a hypothetical question to the vocational expert that was supported by substantial evidence in the record. For these reasons, it is appropriate to remand for further determinations regarding credibility and the conflicting medical opinions of Dr. Soria and Dr. Garfinkel. *See Matney*, 981 F.2d at 1091 (it is the duty of the ALJ and not the reviewing court to resolve conflicts in the evidence); *Dodrill*, 12 F.2d at 919 (remanded for the ALJ to "articulat[e] specific findings for rejecting [the claimant's] pain testimony and the testimony of lay witness."); *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanded because "there are insufficient findings as to whether [the plaintiff's] testimony should be credited as true").

## CONCLUSION

For all of these reasons, the Court concludes the ALJ erred in assessing the opinions of Dr. Soria and Dr. Garfinkel. The ALJ failed to set forth specific, legitimate reasons for rejecting their opinions, and to support these reasons with substantial evidence. In addition, the ALJ did not set

forth clear and convincing reasons for rejecting the testimony of Plaintiff, or germane reasons for rejecting the testimony of Plaintiff's wife, who provided a third party report on Plaintiff's abilities. Finally, the ALJ did not pose a proper hypothetical question to the vocational expert that was supported by substantial evidence in the record.

## ORDER

1.      The Court **HEREBY REMANDS** this matter pursuant to sentence four of 42 U.S.C. §
        405(g) for further proceedings consistent with this decision;

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Brian Kimzey and
        against the Defendant, Commissioner of Social Security.


IT IS SO ORDERED.

Dated:   **March 30, 2011**                                    **/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE